FILED

Jul 14 2017, 8:43 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



ATTORNEY FOR APPELLANT

Kimberly A. Jackson
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

David E. Corey
Deputy Attorney General

Robert J. Henke
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In re the Termination of the
Parent-Child Relationship of
L.R. (Minor Child),

K.S. (Mother),

*Appellant-Respondent,*

v.

Indiana Department of Child
Services,

*Appellee-Petitioner*

July 14, 2017

Court of Appeals Case No.
90A02-1612-JT-2846

Appeal from the Wells Circuit
Court

The Honorable Kenton W.
Kiracofe, Judge

Trial Court Cause No.
90C01-1506-JT-19

**Vaidik, Chief Judge.**

# Case Summary

[1]     Indiana Code section 31-35-2-4 authorizes the filing of a petition to terminate a parent-child relationship when, among other things, the child has been removed from the parent and has been under the supervision of the Department of Child Services (DCS) for at least fifteen of the most recent twenty-two months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services (CHINS).  Here, DCS removed a child from her mother's home and filed a CHINS petition in January 2014.  When it became apparent that a CHINS fact-finding hearing would not be held within the 120-day statutory limit, the parties agreed that DCS would move to dismiss the petition and refile under a new cause number.  DCS did so in May 2014.

[2]     Just over a year later, in June 2015, DCS filed a petition to terminate the mother's parental rights, alleging, in part, that the child had been removed from the mother for at least fifteen months.  The trial court eventually agreed to terminate the mother's rights, and the mother appeals.  Her primary contention is that the trial court should have calculated the period of removal starting with the filing of the second CHINS action in May 2014 because the original CHINS action was dismissed and should be disregarded.  Under this view, the child had been removed for less than thirteen months when DCS filed its termination petition, rendering the petition premature under Section 31-35-2-4.  But because the mother did not object to the dismiss-and-refile procedure, and instead specifically agreed to it, we cannot say that the trial court erred by treating the

two CHINS actions as one continuous proceeding that began in January 2014, seventeen months before DCS filed its termination petition. We affirm the decision of the trial court in this and all other respects.

# Facts and Procedural History[1]

[3] K.S. ("Mother") and M.R. ("Father") are the biological parents of L.R. ("Child"), who was born in November 2008. On the night of January 1, 2014, Mother and Child were sitting in the living room of their apartment in Markle when they heard an explosion—Father had been cooking meth in an adjacent bedroom and blew up his lab. There is evidence that Mother had gone to a store that day, with Child in tow, to purchase meth ingredients. DCS removed Child from Mother and Father and placed her in foster care; Child was later placed with her maternal grandparents.[2]

[4] On January 3, DCS filed a petition alleging that Child was a CHINS. At an initial/status hearing a few days later, the parties agreed to extend the statutory deadline for holding a CHINS fact-finding hearing from sixty days to 120 days, *see* Ind. Code § 31-34-11-1(a), and the trial court set the hearing for April 15.

---

[1] Our review of this matter has been hindered by DCS's failure to adhere to Indiana Appellate Rule 46(A)(6)(c), which requires that the relevant facts be recounted "in narrative form," that is, in "the form of a story." *Narrative*, Webster's Third New International Dictionary (1993). Compliance with this rule is particularly important in termination-of-parental-rights cases, where the key issue is often the progress (or lack thereof) made by a parent from the beginning of the case to the end.

[2] In the summer of 2014, Father pled guilty to Class B felony dealing in methamphetamine and was sentenced to serve fourteen years in prison. At the termination hearing, he testified that his earliest possible release date would be in 2021.

On April 14, however, Father filed a motion to continue the hearing, stating that the parties were "in negotiations regarding an admission[.]" Appellant's App. Vol. III p. 71. The motion indicated that Mother had no objection. The trial court granted the motion and scheduled a status hearing for May 5, noting that "the fact-finding hearing will be reset if needed." *Id*. at 4. At the status hearing, DCS "advise[d] the Court they will be dismissing this cause as they are past the deadline date for scheduling a fact-finding hearing and will be reopening this matter under another cause number." *Id*. In a subsequent order, the court explained:

> The parties were unable to come to an agreement to settle the fact-finding trial. So a further hearing date needs to be scheduled.
>
> The hearing is unable to be held in the One Hundred and Twenty day time frame. So [DCS] will be asking to dismiss the current [CHINS] Petition and will be re-filing and opening under a new cause number. **All parties acknowledge the necessity for this.**

*Id*. at 80 (emphasis added); *see also id.* at 107 ("The parties, by counsel, consented to the procedure for dismissing and re-filing this child in need of services case.").

[5]     As agreed, DCS moved to dismiss its first CHINS petition on May 15, and on May 30 it filed a new but virtually identical petition under a new cause

number.[3]  Mother and Father admitted the allegations in the new petition, and the trial court issued a dispositional order that required them to, among other things: enroll in and participate in any recommended program, obtain any required assessments, keep all appointments, maintain suitable housing, maintain a stable source of income, abstain from using alcohol or any illegal drugs, complete a parenting assessment and all services recommended as a result of the assessment, submit to random drug screens, and attend all scheduled visitations with Child.

[6] While Mother showed flashes of improvement during the CHINS proceedings, she made little meaningful progress toward reunification.  During 2014 and the first part of 2015, she did not maintain consistent contact with the family case manager, who sometimes had to go out of her way to track Mother down; Mother was twice referred to counseling that she failed to complete; she missed appointments with her home-based case manager; she missed several scheduled visitations with Child; she spent time socializing with friends when she could have been with Child; she drank alcohol; she lived in as many as twenty different places, including several motels; she had at least four different boyfriends; and she had and lost four different jobs.  Finally, on April 28, 2015, and again a week later, she tested positive for synthetic cannabinoids after smoking spice.  On May 6, DCS filed a progress report in which it changed its

---

[3] As discussed below, the trial court did not formally grant the motion to dismiss the first petition until September 2015.

permanency plan from reunification to termination of Mother's and Father's parental rights and adoption by relatives. The trial court approved the plan.

[7] On June 8, DCS filed its termination petition. In accordance with the termination statute, Indiana Code section 31-35-2-4, DCS alleged that (1) Child had been removed from Mother and Father and under DCS supervision for at least fifteen of the most recent twenty-two months, (2) there is a reasonable probability that the conditions that resulted in Child's removal or the reasons for placement outside the home will not be remedied and/or that the continuation of the parent-child relationship poses a threat to Child's well-being, (3) termination is in the best interests of Child, and (4) there is a satisfactory plan for the care and treatment of Child.

[8] After DCS indicated its intent to pursue termination, Mother stepped up her efforts. Between June 2015 and the termination hearing on November 20, 2015, Mother began working full-time at a factory, complied with all services, passed all of her drug screens, and began dating and then moved in with a boyfriend who was supportive. Nonetheless, at the termination hearing, the court-appointed guardian ad litem, Child's counselor, and Mother's own mother all recommended termination. The guardian ad litem, who had been involved in the case since the filing of the original CHINS petition, testified that Mother had not given her "any sense that [the] stability will be maintained." Tr. p. 204.

[9] The trial court took the termination matter under advisement, where it remained for the next year. In the meantime, the CHINS case remained active before the same judge. The chronological case summary for the CHINS case, which Mother included in her appendix on appeal, indicates that in 2016, a progress report was filed on April 8, a permanency hearing was held on April 14, another progress report was filed on October 17, and another permanency hearing was held on October 20. *See* Appellant's App. Vol. II pp. 101-03. In its October 17 progress report, DCS explained that "[s]ince the termination trial, [Mother] rarely keeps in contact with [the family case manager], occasionally presents herself at the office for drug screens, and cancels, attempts to reschedule, or reschedules several supervised visitations with her daughter." *Id*. at 210. The family case manager noted her concern that Mother "is not sincere with her participation in services and has only been participating for appearance matters and has manipulated service providers." *Id*. The visitation supervisor was "recommending the visits cease, due to lack of progress made by [Mother] and [Child] has become more irritated with her mother the more the visits continue." *Id*. at 213. DCS indicated that it was "no longer going to be providing services to this family" absent a court order and that it continued to believe that termination and adoption were appropriate. *Id*. at 214-15. On November 21, 2016, the trial court issued an order terminating Mother's and Father's parental rights.

[10] Mother now appeals.[4]

# Discussion and Decision

[11] Mother challenges the termination of her parental rights on three alternative grounds. First, she contends that DCS filed the termination petition prematurely and that the trial court should have dismissed it on that basis alone. Second, she asserts that the manner in which the CHINS and termination cases were litigated deprived her of due process. Third, she argues that the termination judgment is clearly erroneous in light of the progress she made between the filing of the termination petition and the hearing on the petition.

# I. Timing of Petition

[12] Mother first argues that DCS filed its termination petition too soon. Under Indiana Code section 31-35-2-4(b)(2)(A), DCS was required to allege and then prove that, when it filed its termination petition, one of the following was true:

> (i) The child has been removed from the parent for at least six (6) months under a dispositional decree.

> (ii) A court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not

---

[4] Father initially appealed the termination of his rights but then filed a motion to dismiss his appeal, which this Court granted.

required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made.

(iii) The child has been removed from the parent and has been under the supervision of a local office or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child[.]

DCS alleged only the third fact: that "[t]he child has been removed from the parent and has been under the supervision of [DCS] for at least fifteen (15) months of the most [recent] twenty two (22) months." Appellant's App. Vol. II p. 36.[5] Mother maintains that DCS failed to prove this allegation.

[13] Mother acknowledges that DCS removed Child and filed a CHINS petition in January 2014—seventeen months before DCS filed its termination petition, in June 2015—but she argues that the period of removal should not be calculated starting with January 2014. Noting that the first CHINS matter was eventually dismissed, and focusing on the phrase "beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services," Mother contends that Child's removal should be treated as having begun on May 30, 2014—the day on which DCS filed its second CHINS

---

[5] It is unclear why DCS chose not to allege that Child had been "removed from the parent for at least six (6) months under a dispositional decree," since it filed its termination petition on June 8, 2015, more than six months after the trial court issued its dispositional decree (on November 3, 2014). In any event, DCS does not rely on that provision on appeal, nor could it. *See Matter of Bi.B.*, 69 N.E.3d 464, 469 (Ind. 2017) (holding that DCS cannot rely on six-month provision where it was not alleged in termination petition).

petition. Mother's position, in short, is that because DCS ultimately dismissed the original CHINS action, the trial court should have proceeded as if that action and the removal that accompanied it never happened. Under Mother's analysis, the period of removal was less than thirteen months (May 30, 2014, to June 8, 2015), DCS therefore filed its termination petition prematurely, and the trial court should have dismissed it.[6]

[14] We see two problems with Mother's position. First, Section 31-35-2-4(b)(2)(A)(iii) does not include any language supporting her contention that the only CHINS action that can be considered in calculating the period of removal is the one that is pending when the termination petition is filed. The provision simply says that the period begins "with the date the child is removed from the home as a result of the child being alleged to be a child in need of services." Here, it is undisputed that Child was removed from the home in January 2014 as a result of being alleged to be a child in need of services.

[15] Second, there is no indication in the record that DCS moved to dismiss the first CHINS petition because it lacked merit or to somehow game the system or prejudice Mother. Rather, the record shows that the parties were "in negotiations regarding an admission" in the first CHINS action and that the dismissal and refiling were merely a means of addressing the 120-day deadline

---

[6] Mother frames this issue as one of sufficiency of the evidence, but it is really a matter of interpreting Section 31-35-2-4(b)(2)(A)(iii). We see no indication that Mother raised this statutory-interpretation argument in the trial court, but DCS does not contend that she waived it, so we will address it.

for holding a CHINS fact-finding hearing. *See* Appellant's App. Vol. III pp. 4, 71. Most importantly, Mother did not object to the dismissal-and-refiling procedure; to the contrary, she expressly acknowledged the need for it. *Id.* at 80; 107. Therefore, while there may be situations in which removal related to a CHINS action that is later dismissed should not be counted when calculating the period of removal under Section 31-35-2-4(b)(2)(A)(iii), this is not one of them.

[16] The trial court did not err in concluding that Child had been removed from Mother and under DCS supervision for at least fifteen months when DCS filed its termination petition.

## II. Due Process

[17] Mother also contends that even if the termination petition was timely, certain "procedural irregularities" deprived her "of her right to due process" under the Fourteenth Amendment to the United States Constitution. Appellant's Br. pp. 25-26. DCS points out that Mother did not raise a due-process claim before the trial court and asserts that Mother's argument is therefore waived. Because Mother does not deny that she failed to make her due-process claim in the trial court, we agree with DCS that it is waived. *See Hite v. Vanderburgh Cty. Office of Family & Children*, 845 N.E.2d 175, 180 (Ind. Ct. App. 2006) ("It is well established that we may consider a party's constitutional claim waived when it is raised for the first time on appeal.").

[18] Waiver notwithstanding, Mother has not convinced us that she was deprived of due process. Initially, she takes issue with the manner in which the dismissal and refiling of the CHINS proceeding was handled. She notes that the trial court did not rule on DCS's motion to dismiss the first CHINS matter until September 2015, sixteen months after DCS filed that motion (on May 15, 2014); that as a result of the trial court's delay in dismissing the first CHINS matter, it was still pending when the second CHINS matter was opened (on May 30, 2014); and that DCS and the trial court erroneously continued making filings in the first CHINS matter even after the second CHINS matter was opened. Mother is correct that these were mistakes, and easily preventable ones at that. However, we fail to see how they negatively impacted her. Mother maintains that "[t]he filing of the second CHINS petition while the first was still pending appeared to cause multiple referrals and confusion among service providers" and that she "was held responsible for that confusion because it resulted in Mother not completing the services as expected." Appellant's Br. p. 28. But the transcript pages she cites do not support the notion that her service providers were confused as a result of the overlapping CHINS actions. Mother also asserts that "new referrals meant making new arrangements, possibly with new people, and that only made Mother's compliance more difficult," *id.*, but she does not cite any evidence in support of that claim.

[19] Mother also bases her due-process claim on the fact that the trial court did not issue its termination decision until a year after the termination hearing. She argues that "[g]iven her constitutional right to parent," her ability to raise Child

"should have been based on evidence at the time of judgment, not a year earlier." *Id*. However, Mother has not given us any reason to think that she would have fared any better based on "evidence at the time of judgment." To the contrary, the one piece of evidence she has given us—the October 17, 2016 progress report from the CHINS case—fully supports the trial court's termination decision. In the report, DCS made clear that Mother had not made much, if any, progress, since the termination hearing, that her improvement before the termination hearing seemed to have been for the sake of appearances, that visitation was not going well, and that it still believed that termination and adoption were in order. *See* Appellant's App. Vol. II pp. 210-15.

[20] Mother has failed to establish that either the delay or the other procedural irregularities deprived her of due process.

## III. Mother's Progress After Filing of Termination Petition

[21] Finally, Mother asserts that the evidence presented by DCS does not justify the termination of her parental rights. In reviewing a trial court's decision to terminate a parent's rights, we will not reweigh the evidence or judge witness credibility. *In re V.A.*, 51 N.E.3d 1140, 1143 (Ind. 2016). We consider only the evidence and reasonable inferences that are most favorable to the judgment, giving due regard to the trial court's unique opportunity to judge the credibility of the witnesses. *Id*. We will reverse the trial court's judgment only if it is clearly erroneous. *Id*.

[22] Mother frames the issue as whether DCS presented sufficient evidence to support the trial court's conclusions that there is a reasonable probability that the conditions that resulted in Child's removal and placement outside the home of the parents will not be remedied, *see* I.C. § 31-35-2-4(b)(2)(B)(i), and that termination is in the best interests of Child, *see id.* at (b)(2)(C). Appellant's Br. pp. 29-39. However, her actual argument is much more narrow. She contends that termination was improper in light of the fact that, at the time of the termination hearing, she was in a relationship with a supportive boyfriend, she had a steady place to live (with her boyfriend), she was employed full-time, her drug screens were coming back clean, and she was compliant with all services.

[23] There is one very critical flaw in Mother's argument. By her own admission, this state of stability did not begin until after DCS changed the plan from reunification to termination, and it had existed for only a few months at the time of the termination hearing. She did not begin seeing her new boyfriend or return to negative drug tests until June 2015; her compliance with home-based services did not begin until July 2015; she did not start her new job until July or August of 2015; and she did not move in with her boyfriend until September 2015, two months before the termination hearing. It is undisputed that the relative stability between June and November of 2015 was preceded by seventeen months of significant **instability** (from January 2014 through May 2015).

[24] Mother cites our decision in *In re S.P.H.*, 806 N.E.2d 874 (Ind. Ct. App. 2004), for the proposition that the trial court should have based its decision on "her

situation at the time of the termination of parental rights hearing." Appellant's Reply Br. p. 5. It is true that in *In re S.P.H.* we said, as we have said in countless other cases, that "[t]o determine whether conditions are likely to be remedied, the trial court must examine [the parent's] fitness to care for the children as of the time of the termination hearing and take into account any evidence of changed conditions." 806 N.E.2d at 881. But Mother carefully avoids what we said in the next sentence: that the trial court must also "evaluate [the parent's] patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation." *Id.* Our Supreme Court has since said the same thing. *See*, *e.g., In re K.E.*, 39 N.E.3d 641, 647 (Ind. 2015) ("Changed conditions are balanced against habitual patterns of conduct to determine whether there is a substantial probability of future neglect.").

[25] Here, Mother's conduct during the seventeen months before June 2015 plainly support the trial court's decision to terminate her parental rights. She failed to stay in touch with the family case manager and failed to fully participate in the services she was offered, including counseling and home-based services. She missed multiple scheduled visitations and passed up other opportunities to spend time with Child. She drank alcohol and smoked spice. And she moved nearly twenty times, had multiple boyfriends, and changed jobs several times. While there is no question that things appeared to be more stable by the time of the termination hearing, our trial courts have discretion to "weigh a parent's prior history more heavily than efforts made only shortly before termination."

*In re E.M.*, 4 N.E.3d 636, 643 (Ind. 2014). We cannot say that the trial court abused that discretion in this case. In addition, the guardian ad litem, Child's counselor, and the maternal grandmother all testified that, even in light of Mother's pre-hearing improvements, termination remained appropriate. This testimony weighs heavily in favor of the trial court's best-interests determination and its ultimate judgment.

[26] Mother has not convinced us that the trial court's decision was clearly erroneous.[7]

[27] Affirmed.

Bailey, J., and Robb, J., concur.

---

[7] In addition to her broader argument about the changes she had made at the time of the termination hearing, Mother specifically challenges sixteen of the trial court's 133 findings of facts. DCS contends that even if those sixteen findings are set aside, the remaining 117 findings are sufficient to support the judgment. Having reviewed the unchallenged findings, we agree with DCS.